OPINION
By the Court,
Hardesty, J.:
We primarily consider in this appeal whether the Confrontation Clause of the Sixth Amendment to the United States Constitution and the United States Supreme Court’s holding in Crawford v. Washington[1] apply to evidence admitted during a capital penalty hearing. We conclude that they do not apply. We conclude that this issue, along with the others appellant Charles Summers raises on appeal, does not warrant reversal of his conviction and sentence. Therefore, we affirm.

FACTS

Guilt phase

Summers was an illegal drug dealer. Sometime in 2003, he entered into an informal agreement with Frederick Ameen, an addict who owed him money. Summers agreed to provide Ameen *1328 with drugs to sell, primarily “crack” cocaine, and to pay for a motel room from which he could sell the drugs; Ameen was to give Summers the profits from the sales.
On the night of December 28 and early morning of December 29, 2003, Ameen and his associate Albert Paige were in a room at the La Palm Motel in Las Vegas that Summers had rented for Ameen to sell illegal drugs in accordance with their agreement. Summers warned Ameen that only certain people were to be allowed in the motel room. That night, Ameen and Paige were in the room smoking crack cocaine with three other people, one of whom was Donna Thomas, a prostitute and friend of Ameen. When Summers later arrived accompanied by Andrew Bowman, he was upset about the number of people in the room. Ameen told everyone to leave; Paige and Thomas stayed behind.
Bowman briefly left the motel room, but he soon returned and handed Summers a .38 caliber handgun.[2] Summers stood in front of Ameen and Thomas, who were sitting on a bed. Paige was sitting at a small table, and Bowman stood by the door. Summers put on a small glove and resituated the handgun, which was in the pouch of his sweater. Summers told Paige that if he wanted to kill him that he would have, but that Paige was playing him “for some type of fool.’ ’
Summers pulled out the handgun, pointed it at Thomas, and asked Ameen who she was. Ameen explained to Summers that Thomas was a friend, that he had told Thomas about Summers, and that he had instructed her to let Summers enter the motel room. Summers asked Thomas if she knew who he was. Thomas replied in the negative. Ameen reminded Thomas that he had previously told her about Summers. Thomas began to speak when Summers shot her.
Summers then pointed the handgun directly at Paige and pulled the trigger. But the handgun misfired. Summers then pointed the handgun at Ameen, but Ameen did not see Summers pull the trigger. Summers and Bowman then left the room. Thomas later died from the gunshot wound.
Summers was arrested for the incident and charged with several crimes. The State filed a notice of intent to seek a death sentence. The guilt phase of Summers’s jury trial began on March 28, 2005. Summers contended in his defense that it was Ameen who shot Thomas, not him. To support this theory, Summers called a former gang member incarcerated at the Lovelock Correctional Center, Terrence Lee Collins, who testified that he had previously purchased crack cocaine from Summers and that Ameen once confessed to him that he shot Thomas. He also testified that Ameen and Paige had devised a theory to blame Thomas’s murder on *1329 Summers. Summers also presented evidence that an anonymous tip to the police blamed Thomas’s murder on another man and identified Ameen as an accomplice to the crime.
After a four-day trial, the jury found Summers guilty of the first-degree murder of Thomas with the use of a deadly weapon, the attempted murder of Paige with the use of a deadly weapon, and of assaulting Ameen with the use of a deadly weapon.

Penalty hearing

Prior to the penalty hearing, Summers moved to bifurcate the hearing into eligibility and selection phases. The district court denied the motion without explanation.
During the one-day penalty hearing, the State first presented victim-impact evidence from Thomas’s sister and father. They testified that Thomas was the mother of three children, two girls and a boy, and had worked hard to support them before she moved to Las Vegas and “got caught up in life.”
The State then presented numerous witnesses who testified about Summers’s juvenile and adult criminal history while both in and out of custody, as well as exhibits containing approximately 835 pages of documents regarding that history. These documents included: Las Vegas Metropolitan Police Department (LVMPD) records and arrest reports; a 1996 judgment of conviction for robbery and possession of a stolen vehicle; juvenile and family court records; LVMPD gang unit investigation cards; and Clark County Detention Center and Nevada Department of Correction (NDOC) records, which included inmate disciplinary reports.
LVMPD Officer Patrick Rooney testified that Summers was arrested as a juvenile in 1992 for hitting a woman in the head with a bottle. LVMPD Detective Patrick Paorns testified that Summers was also arrested that year for his participation in a carjacking with the use of a deadly weapon. LVMPD Officer Brian Morse testified that Summers was arrested three years later in 1995 as a juvenile for robbery — stealing a woman’s purse — and possession of a stolen vehicle. LVMPD Officer Timothy Schoening testified that Summers was also arrested that year for beating a man with a bottle. LVMPD Officer Clayton Shanor testified about Summers’s disciplinary problems while incarcerated, including fighting and verbal outbursts.
LVMPD Officer Andrew Pennucci testified that he stopped Summers in 2003 for jaywalking. During the stop, Summers turned away from Officer Pennucci and reached beneath his jacket into his waistband. Officer Pennucci testified that he ordered Summers to stop, but Summers did not comply. Officer Pennucci drew his handgun, pointed it at Summers, and ordered Summers to take his hand from his waistband. Summers complied and said, “Okay. Okay. I have a gun.” Officer Pennucci seized a loaded .22 caliber *1330 semiautomatic handgun with a bullet in the chamber from Summers. Summers was arrested for the incident.
Summers’s former juvenile probation officer, Gregory Stanphill, testified that Summers was a very sophisticated juvenile. And LVMPD Officer Thomas Bateson testified about Summers’s gang affiliations. Several other witnesses, including the Warden of Camps for the NDOC, testified that Summers was a discipline problem while he was in custody.
Summers called several family members to testify on his behalf: his uncle, nephew, second cousin, grandmother, and sister. They testified that Summers was the youngest of three children, his mother and father drank alcohol and used illegal drugs, and his father sometimes beat his mother. Summers’s mother and father had since died. Summers had an impoverished childhood, sometimes not having enough food to eat and going to school in dirty clothes. The members of his family also testified about their love for Summers, his belief in God, and how they would write to him while he was in prison. Summers had asked to be removed from the courtroom prior to the start of the hearing and, therefore, did not make a statement in allocution.
The State finally called NDOC Officer Jeffery Moses, who had arrived at the hearing late because of a delayed airline flight. Officer Moses testified that he found a six-inch-long weapon in Summers’s prison cell in 1997 and that Summers took responsibility for having it.
The jury found four circumstances aggravated the murder. Three of the aggravators were found pursuant to NRS 200.033(2) — that the murder was committed by a person who had been convicted of a felony involving the use or threat of violence. These three ag-gravators were based on Summers’s 1996 conviction for robbery and instant convictions for assault with the use of a deadly weapon and attempted murder with the use of a deadly weapon. The other aggravator was found pursuant to NRS 200.033(3) — that the murder was committed by a person who knowingly created a great risk of death to more than one person.
The jury found six mitigating circumstances: the absence of parental guidance; impoverished living conditions and environment; pressured into gang activity; mentors were criminals, gang members, and drug dealers; lack of recommended psychological treatment; and a continuing supportive family. The jurors concluded that the aggravating circumstances outweighed the mitigating but imposed upon Summers a sentence of life without the possibility of parole for Thomas’s murder.
The district court later entered a judgment of conviction on June 30, 2005, sentencing Summers to two consecutive terms of life in prison without the possibility of parole for the first-degree murder with the use of a deadly weapon, and various concurrent and consecutive terms for the attempted murder and assault con *1331 victions. When Summers was asked by the district court during sentencing if he had anything to say, Summers replied, “It is what it is.’ ’ This appeal followed.

DISCUSSION

I. Application of the Confrontation Clause and Crawford v. Washington to a capital penalty hearing
Summers contends that the Confrontation Clause and Crawford apply to a capital penalty hearing and therefore the admission of nearly 835 pages of documentary exhibits containing testimonial hearsay violated his right to confrontation.[3] We disagree.
The Sixth Amendment to the United States Constitution provides: “In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.’ ’ The United States Supreme Court held in its 2004 opinion Crawford that the admission of testimonial hearsay statements violates the Confrontation Clause unless the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine him or her.[4]
We have never fully addressed the relevance of the Confrontation Clause in a capital penalty hearing. This court recognized in Lord v. State[5] that the right to confrontation applies in capital penalty hearings in one respect: admitting a nontestifying codefendant’s confession generally violates a defendant’s right to confrontation under Bruton v. United States.[6] Lord addressed only the Bruton question and did not otherwise explore the right to confrontation at a capital penalty hearing.[7] We limit Lord to its facts.
Guiding our decision today is the Supreme Court’s 1949 opinion Williams v. New York.[8] The Court recognized in Williams that “most of the information now relied upon by judges to guide them in the intelligent imposition of sentences would be unavailable if information were restricted to that given in open court by witnesses subject to cross-examination.’ ’[9] The Court rejected the contention *1332 that a death sentence based on information from witnesses whom the defendant had not been permitted to confront violated the Due Process Clause of the Fourteenth Amendment of the United States Constitution.[10]
Williams has since been relied upon for the proposition that the Confrontation Clause does not apply to capital sentencing.[11] Although the continuing viability of Williams has been called into question,[12] in our view, and that of the Ninth Circuit Court of Appeals, it remains good law.[13] Crawford did not overrule Williams.[14] Indeed, the Supreme Court has yet to address whether its opinion in Crawford has any bearing on any sentencing proceedings, capital or otherwise.[15]
The Court in Crawford indicated no intent or basis to extend the Sixth Amendment to capital penalty hearings. No federal circuit courts of appeals have extended Crawford to a capital penalty hearing, and the weight of authority is that Crawford does not apply to a noncapital sentencing proceeding.[16]
We have recognized that under NRS 175.552(3) hearsay is generally admissible[17] in a capital penalty hearing.[18] Absent controlling *1333 authority overruling Williams and extending the proscriptions of the Confrontation Clause and Crawford to capital penalty hearings in Nevada, we are not persuaded to depart from our prior jurisprudence and extend to capital defendants confrontation rights under Crawford.
We therefore conclude that neither the Confrontation Clause nor Crawford apply to evidence admitted at a capital penalty hearing and the decision in Crawford does not alter Nevada’s death penalty jurisprudence. Because Summers did not enjoy a right to cross-examine[19] the declarants who were the source of alleged testimonial hearsay within documentary exhibits admitted at his capital penalty hearing, he has shown no error occurred on this issue.
The concurring and dissenting justices in this appeal would extend the Supreme Court’s holdings in Ring v. Arizona[20] and Crawford and hold that the right to confrontation applies to the jury’s eligibility determination in a capital sentencing proceeding. Notwithstanding this conclusion, however, the separate concurring and dissenting opinion recognizes that the Confrontation Clause does not apply to the jury’s deliberations with respect to the penalty that should be imposed on a defendant whom the jury has found to be death eligible. Even assuming that our dissenting and concurring colleagues have correctly foreseen that the Supreme Court will someday hold that Crawford and the Confrontation Clause are applicable to the eligibility phase of a capital sentencing proceeding, in our view, Nevada’s capital sentencing scheme permitting unbifurcated penalty hearings would remain constitutionally viable. We submit that such a holding would not require penalty hearings to be fragmented into phases where the jury separately considers and answers the factual questions relating to whether: (1) the alleged aggravating and mitigating circumstances have been established, (2) the aggravating circumstances outweigh any mitigating circumstances, and (3) the penalty of death should actually be imposed on a defendant whom the jury has found to be death eligible.
In this, we note that this court generally presumes that juries follow district court orders and instructions.[21] In Tavares v. State,[22] for example, this court implicitly recognized that jurors are intellectu *1334 ally capable of properly following instructions regarding the limited use of prior bad act evidence. If jurors can perform an act of intellectual discrimination permitting consideration of prior bad act evidence for one purpose, but not for another, they are most certainly intellectually capable of following a clear instruction directing that they must refrain from considering testimonial hearsay in deciding a capital defendant’s death eligibility, but that they may nonetheless consider such evidence in deciding whether to actually impose a death sentence on a defendant whom they found eligible to receive it.[23] Our view in this respect is confirmed by the fact that the jurors in the instant case found the aggravating circumstances outweighed the mitigating circumstances but did not sentence Summers to death. Thus, the jury’s verdict in this case clearly evinces the jury’s capability to intellectually discriminate between the types of evidence presented and to impose a just sentence.
II. Other claims raised by Summers on appeal
In addition to his Confrontation Clause and Crawford claim, Summers raises four other claims on appeal. We have carefully reviewed each of these claims, and we conclude that they do not warrant any relief.
First, Summers contends that juror 661 was biased because one of the prosecutors once dated her daughter. However, Summers did not challenge juror 661 for cause, and our review of her examination during voir dire does not reveal that she was biased or improperly seated in violation of his constitutional right to a fair and impartial jury.[24]
Second, Summers contends that the district court committed judicial misconduct and failed to exercise self-restraint and impartiality during his counsel’s cross-examination of State witness Albert Paige by interpreting Paige’s answers and failing to admonish Paige for answering questions with questions. However, the cross-examination of Paige was contentious, and the district court *1335 was acting to maintain control over the trial and did so without clear objection from Summers.[25]
Third, Summers contends that the district court abused its discretion by denying separate motions for a mistrial. One motion was made during the guilt phase based on a statement by State witness Frederick Ameen regarding threats to his life. However, this statement was not elicited by the State, and the district court ordered it stricken. The other motion was made during the penalty hearing and was based on several instances of alleged prosecutorial misconduct. We discern no misconduct in the instances cited by Summers on appeal. Summers has failed to demonstrate the district court abused its discretion by denying either of his mistrial motions.[26]
Finally, Summers contends that he was denied a fair trial because of cumulative error.[27] For the reasons already discussed above, we conclude that Summers is not entitled to relief on this claim or any other he raises on appeal.

CONCLUSION

Neither the Confrontation Clause nor Crawford extends to evidence admitted during a capital penalty hearing. We conclude that this issue, along with the others Summers raises, does not warrant reversal of his conviction or sentence. We affirm.
Becker, Gibbons and Parraguirre, JJ., concur.

 541 U.S. 36 (2004).

 Bowman testified at trial that Summers actually had the handgun when the two initially entered the motel room.

 The State contends that this issue was improperly preserved for our review. Although Summers’s objections to the admission of the documents were less than specific, we conclude that they were sufficient to preserve this issue for our review.

 541 U.S. at 68-69.

 107 Nev. 28, 43-44, 806 P.2d 548, 557-58 (1991).

 391 U.S. 123, 137 (1968).

 Cf. Kaczmarek v. State, 120 Nev. 314, 335-36, 91 P.3d 16, 31 (2004) (concluding that barring a defendant from cross-examining a witness regarding her opinion on the proper sentence during a capital penalty hearing did not violate the Sixth Amendment).

 337 U.S. 241 (1949).

 Id. at 250.

 Id. at 242-52.

 See, e.g., Szabo v. Walls, 313 F.3d 392, 398 (7th Cir. 2002) (citing Williams for the proposition that “the Supreme Court has held that the Confrontation Clause does not apply to capital sentencing”); Bassette v. Thompson, 915 F.2d 932, 939 (4th Cir. 1990); see also U.S. v. Littlesun, 444 F.3d 1196, 1198-1200 (9th Cir. 2006) (citing Williams in holding that Crawford did not alter its jurisprudence that hearsay is generally admissible at noncapital sentencing), cert. denied, 127 S. Ct. 248 (2006).

 See U.S. v. Brown, 441 F.3d 1330, 1361 n.12 (11th Cir. 2006); Maynard v. Dixon, 943 F.2d 407, 414 n.5 (4th Cir. 1991) (recognizing that conflicting authority exists as to whether the Confrontation Clause applies in capital penalty hearings).

 See Littlesun, 444 F.3d at 1200.

 Id.

 See U.S. v. Katzopoulos, 437 F.3d 569, 574 (6th Cir. 2006) (“An issue unaddressed by Crawford is whether the Sixth Amendment right to confront witnesses applies similarly at sentencing.”).

 See, e.g., U.S. v. Luciano, 414 F.3d 174, 179 (1st Cir. 2005); U.S. v. Martinez, 413 F.3d 239, 242-43 (2d Cir. 2005), cert. denied, 546 U.S. 1117 (2006); U.S. v. Stone, 432 F.3d 651 (6th Cir. 2005), cert. denied, 127 S. Ct. 129 (2006); U.S. v. Roche, 415 F.3d 614, 618 (7th Cir. 2005), cert. denied, 546 U.S. 1024 (2005); U.S. v. Brown, 430 F.3d 942, 943-44 (8th Cir. 2005); Littlesun, 444 F.3d at 1199-1200; U.S. v. Chau, 426 F.3d 1318, 1323 (11th Cir. 2005).

 Evidence must still be reliable and relevant, and the danger of unfair prejudice must not substantially outweigh its probative value. See Hollaway v. State, 116 Nev. 732, 746, 6 P.3d 987, 997 (2000); Parker v. State, 109 Nev. 383, 390-91, 849 P.2d 1062, 1066-67 (1993).

 See Thomas v. State, 114 Nev. 1127, 1147, 967 P.2d 1111, 1124 (1998).

 But this court has recognized in Buschauer v. State, 106 Nev. 890, 894, 804 P.2d 1046, 1048-49 (1990), a limited right to cross-examination during a criminal sentencing proceeding. Our decision today does not overrule Buschauer.

 536 U.S. 584 (2002).

 See Allred v. State, 120 Nev. 410, 415, 92 P.3d 1246, 1250 (2004).

 117 Nev. 725, 733, 30 P.3d 1128, 1133 (2001).

 See also Harris v. New York, 401 U.S. 222 (1971) (statements elicited from a defendant in violation of Miranda v. Arizona, 384 U.S. 436 (1966), can be used to impeach the defendant’s credibility, even though they are inadmissible as evidence of guilt, so long as the jury is instructed accordingly); Spencer v. Texas, 385 U.S. 554 (1967) (evidence of a defendant’s prior convictions could be introduced for purposes of sentence enhancement, so long as the jury was instructed it could not be used for purposes of determining guilt).

 See Weber, 121 Nev. 554, 585, 119 P.3d 107, 125 (2005); see also United States v. Martinez-Salazar, 528 U.S. 304, 313 (2000); Ross v. Oklahoma, 487 U.S. 81, 88 (1988).

 See Oade v. State, 114 Nev. 619, 621-22, 960 P.2d 336, 338 (1998) (holding that “[a] trial judge has a responsibility to maintain order and decorum in trial proceedings” and allegations of “[¡Judicial misconduct must be preserved for appellate review”).

 See Rudin v. State, 120 Nev. 121, 142, 86 P.3d 572, 586 (2004).

 See Hernandez v. State, 118 Nev. 513, 535, 50 P.3d 1100, 1115 (2002) (“The cumulative effect of errors may violate a defendant’s constitutional right to a fair trial even though errors are harmless individually.”).